IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

REID MACHINERY, INC., et al.,

       Plaintiff,     Case No. 3:07 CV 2866

   -vs-

              <u>MEMORANDUM   OPINION</u>

NICHOLAS LANZER, et al.,

       Defendant.

KATZ, J.

This matter is before the Court on Defendants Deputy Nicholas Lanzer, Deputy Jeffery Romes, Williams County Engineer Dennis Bell, and Sheriff Kevin Beck's motion for summary judgment (Doc. 64), Plaintiffs Reid Machinery Inc. and Howard Douglas Robinson's response (Doc. 85), Defendants' reply (Doc. 92), and Plaintiffs' sur-reply (Doc. 99).  Additionally, Defendants have filed two motions to strike (Doc. 93, 94) to which Plaintiffs have responded (Doc. 95, 96).

The Court has reviewed over one thousand pages of testimony and evidence as well as the numerous and lengthy briefs filed by the parties.  After this careful review and after consideration of applicable law, the Court grants Defendants' motion for summary judgment on all federal claims (Doc. 64), and dismisses as moot Defendants' motions to strike (Doc. 93, 94).  Plaintiffs' state-law claims are dismissed without prejudice.

**I. Background**

This case centers on the determination made by two Williams County Sheriff's Deputies on April 26, 2007 that a Special Hauling Permit ("SHP") issued to Plaintiff Reid Machinery by the Ohio Department of Transportation ("ODOT") was null and void.

  **A. Facts**

### 1. April 19, 2007 Movement to Pioneer, Ohio

On April 18, 2007, Reid Machinery applied for and obtained a SHP issued by ODOT for the movement of an "Ormig Crane" from Lansing, Michigan to Pioneer, Ohio.  (Dep. Exhibit 42 and 59; *see also* Dep. Exhibit 61).  On April 19, 2007, Ed Reid drove a single trailer loaded with a 60 TM Ormig Crane to Pioneer Forge.  Deputies Romes and Lanzer ("the Deputies") were informed that a vehicle appearing to be overweight and over-dimensional was traveling north on State Route 15 and then east on the local street, Industrial Avenue, into Pioneer Forge.  (Romes Dep. p. 112).  The Deputies traveled to Pioneer, where they observed the crane at Pioneer Forge. (Romes Dep. p. 112-114).

The Deputies obtained a copy of the specifications for the 60 TM crane which showed its weight to be 79,200 pounds, and its width to be 9 feet 8 inches.  (Romes Dep. p. 114-115; Romes Aff. Exhibit C).  This conflicted with the weight (75,000 pounds) and dimensional information (9 feet zero inches) contained on the April 19 SHP.  The Deputies concluded that the crane had likely been moved illegally.  (Romes Dep. p. 114; Lanzer Dep. p. 51-56, 65, 70).

On the evening of April 19, as the Deputies were stationed in the vicinity of Pioneer Forge, they observed workers leave the Pioneer Forge premises.  Because the workers were departing Pioneer Forge with the trailer but without a valuable piece of equipment that appeared to have completed the job, the Deputies' suspected that Ed Reid either: a) realized its existing SHP was invalid and a valid one must be obtained before further travel; or b) might try to sneak the crane out of Pioneer Forge at a later time under the existing permit that was likely invalid.  (Romes Affidavit at ¶ 6).  Defendants claim that the Deputies' suspicion regarding the legality of the April 19 movement caused them to be concerned about the legality of future movements.

2

### 2. The Stop and Investigation of April 26, 2007

On April 26, 2007 in Lansing, Ed Reid instructed  Doug Robinson to pick up the crane in Pioneer and bring it back Lancing.  (Robinson Dep. p. 19-20).  Later that morning, the Deputies, while on patrol, observed an empty "super-load" triple trailer traveling west-bound on U.S. Route 20 toward Pioneer. (*See* Dep. Exhibit 22).  The Deputies spoke with officials at Pioneer to inquire about any local permits that had been obtained authorizing travel on Industrial Avenue.  (Dep. Exhibit 21; Lanzer Dep. p. 25-27).  The Deputies claim to have consulted the ODOT SHP data base, and found that no permit had been issued authorizing the unit to travel from Lansing to Pioneer, Ohio.  (Lanzer Dep. p. 30-31. 35).  Rather, they discovered that a SHP had been issued authorizing travel one-way, from Pioneer Forge to Lansing.  (Lanzer Dep. p. 33).  The SHP allowed the rig's load to weigh up to 165,000 pounds and the crane alone to weigh up to 95,000 pounds.  (Dep. Exhibit 8).

The SHP issued for the east-bound movement from Pioneer back to Lansing caused the Deputies to be suspicious.  The permit identified the load as the 45 TM Crane, but based on their prior research, the Deputies believed that the crane on-site at Pioneer Forge was actually the 60 TM.  (Robinson Dep. p. 49-50 ; *see also* Lanzer Dep. P. 67-68).  The permit identified the width of the vehicle as 9 feet 6 inches wide, but the Deputies believed that the crane was 9 feet 8 inches wide.  (Lanzer Dep. p. 67-68, 115).

At 9:32 a.m., the Police Chief of Pioneer spoke to the Deputies by phone and advised the Deputies that the crane was being loaded.  (Dep. Exhibit 33).  The Deputies decided to initiate a traffic stop of the Reid vehicle "out in the county."  (Dep. Exhibit 33).  The Deputies were

familiar with the roads and parking lots at Pioneer Forge and knew the rig must travel on Industrial Avenue to depart.  (Lanzer Dep. p. 71).

Around 11:00 a.m., the Deputies encountered the vehicle loaded with the 60 TM crane traveling eastbound on U.S. 20 traveling away from Pioneer.  (Lanzer Dep. p. 44, 46; Dep. Exhibit 22). The Deputies claim to have observed that the front trailer lacked a license plate, and the rear trailer license plate did not match the rear license plate identified on the SHP.  (Lanzer Dep. p. 71-73; 82-84, *see also* Robinson Dep. p. 47).

### i. Stop of Rig

At 11:16 am, the Deputies initiated a stop of the rig.  (Dep. Exhibit 22).  As Romes approached the cab, he grabbed the rear passenger chain and tie-down and observed that they were loose.  (Romes Dep. p. 27).  The Deputies also had concerns regarding the rig's bulging tires and its sluggish movement. (Dep. Exhibit 25).  Romes claims to have informed the driver that he had been stopped because the Deputies believed he was exceeding the legal requirements for gross weight, legal width, and legal length of combination vehicles.  (Romes Dep. p. 17).

Robinson said the officer who approached him was well-mannered, asked for the permits and registration materials, and asked for general information about the load.  (Robinson Dep. p. 60-63; *see also* Romes Dep. p. 16, 23-24).  However, Robinson also claims that the Deputies announced either "I am the DOT" or "I am the DOT weigh master."  (Robinson Aff. ¶ 13; *but see* Robinson Dep. 64-65).  Robinson also claims that the Deputies announced that they were conducing a "random stop" for a "routine inspection."  (Robinson Aff. ¶ 12; Robinson Dep. 64).

Robinson was unable to produce registration for the trailers.  (Robinson Dep. p. 62-63; Romes Dep. p. 90).  Robinson also was unable to resolve the Deputies' concerns about the

4

description, dimension, and weight of the load as they appeared on the SHP, nor the concerns about the license plates. (Robinson Dep. p. 63; Romes Dep. p. 90). The Deputies observed the vehicle and determined that the crane exceeded the load width permitted under the SHP, that the crane was not secure, and that the vehicle and load posed a safety hazard. (Robinson Dep. p. 63; Romes Dep. p. 25-26, 90).

Deputy Romes advised Robinson that it would be necessary to move the vehicle from the state highway to a side road where it could be properly measured and weighed. (Robinson Dep. p. 65). The parties and rig moved to a side road where the Deputies blocked traffic and continued with the investigation. (Romes Dep. p. 19, 21). This involved checking for traffic, positioning the escort vehicle, positioning the patrol vehicle, directing the driver and rig through the turn, reopening US-20, and setting cones in the new location. (Romes Dep. p. 30).

Deputy Romes informed Robinson that the vehicle would be escorted back to the County Garage. (Romes Dep. p. 70-71). Several times as the work was unfolding, Romes claims to have expressed concern to the driver that he or his company may make efforts to obtain a valid, replacement SHP. (Romes Dep. p. 66-67). Reid disputes this. (Reid Aff. ¶¶ 23-25).

The Deputies' investigation confirmed that the SHP did not accurately describe the load, and the license plates did not match those stated on the permit. (*See* Dep. Exhibit 12 and 14; *compare* Dep. Exhibit 8 with 13). The vehicle and load exceeded the width dimensions and the axel spacings granted on the permit. (*Compare* Dep. Exhibit 26 with 8). Robinson did not hold an appropriate commercial driver's license. (Robinson Dep. p.17-18). The chains securing the load were found to be under the strength required by federal load securement standards. (Dep.

Exhibit 29).  Robinson admits he was not arrested or personally taken into custody and was told that the vehicle could depart with a valid SHP.  (Robinson Dep. p. 75, 74).

Reid and Robinson state that the Deputies did not allow physical alterations to the vehicle to be made at the scene. (Robinson Aff. ¶ 22, Reid Aff. ¶ 26).  Reid claims that Romes made no attempt to determine if there was a suitable place closer than the Williams County Engineer's Garage where the vehicle could be stopped and made legal.

### ii. County Garage

Before the 3:47 p.m. departure, the Deputies obtained routing instructions from ODOT. The rig arrived at the garage at 4:56 p.m.  (Lanzer Dep. p 105).  Defendants claim that the escort was slowed because Robinson had difficulty turning the rig and ran over a drain in the Village of Alverton.  The rig was stopped and the parties had to wait for Village officials to make a repair before the escort could continue.  (Romes Dep. p. 60).  Plaintiff claims that Robinson was ordered by Lanzer and Romes to drive the vehicle by a circuitous route of some 31 miles to be impounded at the Williams County Engineer's Garage.  (*See* Dep. Exhibit 30).

A citation was issued for four traffic violations: (1) R.C. § 5577.04, 60,850 lbs., in excess of 80,000 lbs.; (2) R.C. § 4513.02, Unsafe Vehicle; (3) R.C. § 5577.05 Overall Width; and (4) R.C. § 4513.34 Special Hauling Permit Violation.  Lanzer calculated the fine and costs to total $2,476.00 and wrote that sum on the traffic citation.  (Robinson Aff. ¶ 23).

At the County Garage, Robinson requested that the Deputies write down some of the information pertaining to some of the violations.  (Romes Dep. p. 60).  Romes attempted to write down the accurate weights, axle spacings, load width, and load description.  (Romes Dep. p. 60; Dep. Exhibit 87).  The Deputies also wrote down the address of the County Garage, and phone

numbers where someone could be reached.  (*See* Dep. Exhibit 87).   The very bottom of the document contains a note "to get a county permit."  (Dep. Exhibit 87).

During his deposition, Robinson claimed he was told a county permit was needed, other times he said he was told to get a court order.  (Robinson Dep. p. 69-74, 99-105, 107-08, 109).  However, Mr. Robinson testified that what needed to be done to resume travel was written down on the paper that the Deputies gave him (Dep. Exhibit 87; Robinson Dep. p. 69-70).  Ed Reid claims to have heard this discussion over a two-way radio and believes that Robinson was told that a new SHP and a court order was required.  (Reid Aff. ¶ 28).

### iii. Reid's Response to the Enforcement Action

On April 27, 2007, based on her reading of Dep. Exhibit 87, Reid's Secretary Brenda Benton incorrectly assumed she needed a Williams County permit.  (Benton Dep. p. 74-75).  Reid's attorney, Fred Lovejoy, received information from a clerk in the Bryan Municipal Court that led him to the conclusion that an order from the Municipal Judge was needed to release the rig.  (Lovejoy Dep. p. 18-19).

On May 1, 2007, Lovejoy wrote a letter to the Bryan Municipal Court asking for the release of the rig, to which a Municipal Court Judge North signed a note that stated "Release vehicle, as long as load is now legal."  This order was ultimately unnecessary.  Reid eventually applied for and received the appropriate document.  The relevant replacement permit was issued and became effective Tuesday May 1, 2007.  (Dep. Exhibit 64).

On the morning of May 1, Deputy Romes informed Ed Reid that the Deputies had observed a copy of the SHP on-line, and that they were waiting for someone from Reid to come and retrieve the vehicle.  (Romes Dep. p. 93-95).  Mr. Reid arrived at the Williams County

Engineer's office with a copy of the SHP replacement permit.  The Deputies reviewed the permit and the vehicle was allowed to resume travel.  (Lanzer Dep. p. 8; Reid Aff. ¶¶ 44, 45).

### 2. The Springfield Job

Randy Alexander, who does business as R. C. Fleet Service, offered Reid a job in Springfield, Illinois, which required Reid to utilize two heavy duty pick and carry cranes, one of which was the crane loaded on the truck which was stopped by Lanzer and Romes.  Alexander's customer ultimately agreed to hold the job open until the close of business on April 30, 2007.  (Alexander Aff. ¶¶ 5, 12).  By the time Reid's vehicle was released, Alexander's customer had obtained an alternative rigger. (Alexander Aff. ¶ 16).

### B. Applicable Statutes and Regulations

Because of their importance to this case, the Court offers a brief explanation of Ohio's laws that limit the dimensions, size, and weight of vehicles and loads moving on the state highway system.  Vehicles are prohibited from operating upon the state's public streets, highways, bridges or culverts which are in excess of the weights and dimensions established in Chapter 5577 of the Revised Code, "except upon special permission, granted as provided by Section 4513.34 of the Revised Code."  R.C. §5577.02; §5577.05.

The distribution of Special Hauling Permits ("SHP") are the responsibility of the Ohio Director of Transportation.  R.C. §4513.34.  In order to obtain a SHP, applications must be submitted which "accurately and completely describe the vehicle and load."  Ohio Adm. Code §5501:2-1-02(C).  Often haulers, including Reid, use a third party agent, such as Interstate Permit Service, to assist in obtaining a SHP.  (Reid Dep. p. 144).

8

Because all SHPs are issued from Columbus, ODOT does not independently verify the contents of applications, and it must rely upon the truthfulness of information supplied by the applicant.  (Honefanger Dep. p. 110-11).  Some applications for SHPs are referred to as "super-load" permit applications, because the size of the vehicles and loads require a more detailed analysis be conducted by ODOT's structural engineering group.  (Honefanger Dep. p. 17. 110).  In such cases, additional restrictions may be imposed, and additional time is often needed before a permit can be issued. (Honefanger Dep. p. 17. 110).

The computer technology ODOT utilizes to track SHP permit applications allows ODOT personnel and others, including law enforcement officers, to view SHPs which have been issued and those in process on computer screens.  (Honenfanger Dep. p. 121-23; Lanzer Dep. p. 30-31).  Law enforcement officers can, therefore, utilize a laptop computer from their squad car to access the ODOT SHP system and determine what permits, if any, have been sought by or issued to a particular trucker.  (Honenfanger Dep. p. 121-23; Lanzer Dep. p. 30-31).

A SHP consists of: a) the face of the SHP which contains the vehicle, load, and routing information specific to this particular permit, and b) additional limitations and provisions that are common to all SHPS set forth on an ODOT form known as the OS-1A.  (Dep. Exhibit 53 p. 3-4).  Non-compliance with the general provisions of the OS-1A, or an operation exceeding the weights or dimensions granted "shall render the permit null and void and the operator of the vehicle subject to arrest."  (*Operational Guide: Oversize and Overweight Movements on State Highways, Application Manual*, published by the Ohio Department of Transportation, Section XIII; *See* Attachment to Aff. of Jeffery Romes).  In the case of super-load permits, additional "special limitations" are set forth on a final page.  (Dep. Exhibit 53, p. 5).

9

Here, the SHP issued to Reid inaccurately identified the load as a "Crane Ormig 45 TM." (Dep. Exhibit 53).  It was actually an Ormig 60 TM crane.  The SHP also identified the load weight and dimensions, gross weight, weight per axel, and the axel spacings for each of the axels. Here, the Deputies ultimately determined that the license data, load width, and axel spacings and weight per axel as stated on the SHP's face were all incorrect.  (Dep. Exhibit 26, Romes Dep. p. 115-117).

## II. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id*. at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply

10

[to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position.  *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted ... to judge the evidence or make findings of fact." *Williams*, 154 F.Supp.2d at 1071.  The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F.Supp.2d 928, 930 (S.D.Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**III. Discussion**

11

Plaintiffs claim the following violations of 42 USC § 1983: (1) Robinson was detained by Defendants Lanzer and Romes without probable cause thus violating his rights against unreasonable seizure as guaranteed by the Fourth Amendment and the Commerce Clause; (2) Robinson was prosecuted without substantive and procedural due process of law for violating Ohio's overweight laws and Ohio's Special Hauling Permit law in violation of the Fifth and Fourteenth Amendments; (3) Reid Machinery, Inc.'s Ormig Crane was unlawfully seized by Defendants Lanzer and Romes in violation of Reid's rights as guaranteed by the Fourth Amendment; (4) Reid's Ohio Special Hauling Permit was declared void without due process of law and the Ormig crane was detained for five days contrary to Reid's rights to substantive and procedural due process of law as are guaranteed by the Fifth and Fourteenth Amendments and the Commerce Clause.

Plaintiffs maintain that the excessively prolonged detention of the crane was pursuant to an unconstitutional policy enacted by Defendants Beck and Bell, the Williams County Sheriff and Engineer who enacted said policy in their official capacities.  The policy also deprived Robinson and Reid to rights guaranteed by Ohio Revised Code § 4513.33 and prevailing Ohio law. Robinson also states a pendant Ohio claim for malicious prosecution or in the alternative, abuse of process.  Reid also states a pendant Ohio claim for conversion of the Ormig crane.

### A. Claims Under 42 U.S.C. § 1983

"To sustain a § 1983 claim, [a] plaintiff must establish that [he/she] was deprived of a right secured by the Constitution or laws of the United States, and that this deprivation was caused by a person acting under the color of state law." *Memphis, Tenn. Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S.

149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)); *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995)).

### 1. Fourth Amendment

"The Fourth Amendment guarantees 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Whren v. United States*, 517 U.S. 806, 809 (1996).

### i. Reasonable Suspicion

"The Fourth Amendment permits a police officer to stop a vehicle if specific and articulable facts give him reasonable suspicion that an occupant is committing a crime." *U.S. v. Keith*, 559 F.3d 499, 499 (6th Cir. 2009) (citing *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968)). "Reasonable suspicion of an ongoing misdemeanor is adequate justification" for an investigatory traffic stop. *U.S. v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008). Reasonable suspicion requires more than an "unparticularized suspicion" or "hunch" but less than probable cause of criminal conduct. *Id*.; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989). To assess the validity of a *Terry* stop, the court considers the totality of the circumstances and "all of the information available to law enforcement officials at the time." *United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) (citation omitted). "The experience of the law enforcement officer must be taken into account in determining whether his or her suspicion was reasonable, and we allow officers to make inferences from the information available to them that 'might well elude an untrained person.'" *Keith*, 559 F.3d at 499 (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

Ohio courts consider an officer's specific training and experience in weight and dimension enforcement to create greater reason to find a stop reasonable. Mere observation of the physical

characteristics and the nature of the operation of the vehicle is enough to create reasonable suspicion of a potential violation and justify a stop and weighing under Ohio R.C. §4513.33.  *See e.g. City of Athens v. Osborne*, Case No. 02-CA-8, 2002-Ohio-5362 (Athens Co. App. Sept. 26, 2002) (trooper's observations of rip-rap stone heaping over the sideboards, coupled with past experience and training created reasonable suspicion justifying stop); *State v. Swain*, Case No. 2005-CA-00243; Westlaw 1495076, *3-4 (Stark Co. App. May 30, 2006) (stop was proper when officer with experience and training in weight enforcement saw a truck with bulging tires, moving slow, had difficulty making a turn, pulling hard and blowing black exhaust).

Here, the officers had specific training and experience in weight and size enforcement. Defendants identified sixteen different training manuals or instructional books the Deputies obtained during their training, consisting of over 6,000 pages of material.  The training is, according to Mr. Honenfanger, "a comprehensive orientation." (Honenfanger Dep. p. 109).  The Deputies have been trained by ODOT that utilization of banners and flags is tantamount to a declaration that the vehicle is violating Ohio law and should be stopped to verify the legality of the movement.[1]  (Honenfanger Dep. p. 124-25, 146-48).

Furthermore, the Deputies knew that: (1) Reid had transported a single crane to the Pioneer site on April 19, 2007 and that the same crane was likely still there (Romes Dep. 113-14, 122); (2)

---

[1]

 Plaintiffs use this statement to argue against the constitutionality of stops initiated when a rig is simply displaying flags and banners.  However, this argument lacks complete relevance in this case because the existence of flags and banners was not a significant factor generating the Deputies' suspicion that the movement may have been illegal.  Also, the parties have not addressed whether Honefanger's statement is the actual policy of the ODOT or simply the belief of one of its employees.  As a result, the Court shall not render an advisory opinion on the unanswered question as to whether a stop premised solely on the display of flags and banners is reasonable under the Fourth Amendment.  *See e.g. Delaware v. Prouse*, 440 U.S. 648, 659 (1979) (concluding that random checks of the validity of drivers' licences is unconstitutional).

14

the crane identified on the SHP for the April 19 movement was for a 45 TM but the Deputies believed that the crane in Pioneer was a 60 TM (Romes Dep. 121-24); (3) the specification information contained on the SHP for the April 19 movement into Pioneer differed from the specification information they obtained from the crane manufacturer, suggesting that the false information might also be included on the later SHP that would be required for movement away from Pioneer (Romes Dep. 114); (4) Reid had failed to obtain a permit for travel on the local street, Industrial Drive (Romes Dep. 114); (5)  Reid had failed to obtain a SHP for movement of the empty rig into Ohio for the morning of April 26 (Lanzer Dep. P. 30-31, 35; Romes Dep. 118); and (6) the crane was being loaded on the morning of August 26 (Exhibit 33).

Plaintiffs claim that the Deputies decided to initiate the stop at 9:32 a.m. based on the phone conversation between Romes and Acting Pioneer Police Chief Stan Bryner and without knowing if a SHP had been issued.  In the conversation, Romes learned that Plaintiffs were going to load one or more cranes and Romes decided that the best place to stop the vehicle was on a country road.  (Exhibit 33).  Plaintiffs claim that Defendants have made post hoc rationalizations for the traffic stop.

However, Plaintiffs' arguments fail to recognize that the legality of police conduct implicating the Fourth Amendment is reviewed by considering whether at the time of the stop, seizure, or arrest, the officer had reasonably trustworthy information sufficient to warrant a prudent man in believing that the action taken was appropriate.  *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968); *U. S. v. Campbell*, 486 F.3d 949, 955,958 (6th Cir. 2007); *State v. Andrews*, 57 Ohio St. 3d 86, 87 (1991).  The propriety of the conduct is viewed in light of the totality of the surrounding

circumstances, not those at an isolated moment in time. *Gardenhire v. Schubert*, 205 F. 3d 303, 315 (6th Cir. 2000); *Dayton v. Erickson*, 76 Ohio St. 3d, 3, 11-12, 1996-Ohio-431.

After the 9:32 phone call and before the Deputies stopped the vehicle, the Deputies viewed an electronic copy of the SHP that identified the 45 TM, not the 60 TM, (Romes Dep. 124) which listed a load weight that differed from the load weight that Reid identified with the 60 TM on prior permits. Furthermore, as they came closer to the vehicle before the stop, the Deputies observed the lack of a license plate on one trailer, the incorrect positioning of another, the rig's bulging tires, a sluggish movement, and loose tie-down chains. (Exhibit 25; Romes Dep. 27). Plaintiffs respond by alleging (1) Defendants failed to evidence the fact that the Deputies actually checked their computers to research the SHP, and (2) the Deputies' suspicions regarding the licence plates, tires, movement, and chains were manufactured after-the-fact for the purposes of this lawsuit. However, absent specific facts or evidence disproving the Deputies' testimony and the numerous government records submitted to this Court, Plaintiffs' allegations do not create a genuine issue of material fact. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Considering all that was known prior to the stop of the vehicle, the stop was legal. The Court finds that the Deputies had reasonable suspicion to believe that the vehicle was traveling in violation of Ohio law.

### ii. Detention of Vehicle and Driver

The Court turns to whether the temporary detention of the rig and driver while the legality of the movement was investigated was proper under the Fourth Amendment.

### a. Roadside Detention

16

A roadside detention is lawful under the Fourth Amendment if the officer has probable cause to believe that the motorist has violated the traffic laws.  *See United States v. Burton*, 334 F.3d 514, 516 (6th Cir. 2003); *U.S. v. Garrido* 467 F.3d 971, 977-978 (6th Cir. 2006).  The Court concludes that the numerous facts which established a "reasonable suspicion" above also suffice to establish "probable cause."  Thus, detention of the rig at the roadside while the investigation occurred was constitutional.

### b. Duration of Stop

Plaintiffs believe that the duration of the investigatory stop was unreasonable.  No rigid time limit applies to the constitutional duration of roadside investigatory stops.  *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993).  When an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate.  *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999); *see also U.S. v. Taylor,* 955 F.Supp. 763 (E.D.Mich., 1997).  The Sixth Circuit has ruled that if a detention or delay is related to the law enforcement officer's legitimate investigation, and the officers were not dilatory in their investigation, then there is no Fourth Amendment violation.  *See U.S. v. Sharpe*, 470 U.S. 675, 687-688 (1985); *see also United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176, (2000).

The Ohio General Assembly has determined that law enforcement officers may hold a vehicle for a "reasonable time" to accomplish weighing.  *See* Ohio R. C. §4513.33.  Ohio's Sixth District has held that "for a detention to be reasonable under R.C. 4513.33, the weighing must be completed, including the issuance of a citation, if any, within five hours of the initial stop."  *State v. Wells*, 11 Ohio App.3d 217, 225 (Lucas Co. App. 1983).

The actions taken by Defendants Romes and Lanzer after the initial stop are not outside of these Constitutional parameters.  The Deputies stopped the vehicle at 11:16 a.m.  In addition to being weighed, the vehicle was measured dimensionally.  Also, axel spacing measurements were taken, the strength of the chains was assessed, and routing instructions were obtained from ODOT.  Robinson's drivers licence was examined and determined to lack the correct commercial drivers licence endorsement.  Four hours and 34 minutes after the initial stop, at 3:47 p.m., the parties departed the scene of the weighing.  At this point, in accordance with Williams County policy, the Deputies escorted to the County garage.

### c. Escort Policy

Plaintiffs assert Fourth Amendment violations based on the escort policy and the application of the policy by the individual law enforcement officers.  This claim relates to municipal liability because Courts treat suits against municipal officials in their official capacity as suits against the municipality.  *Pusey v. City of Youngstown*, 11 F.3d 652, 658 (6th Cir. 1993).  As a result, Plaintiffs must show that a policy or custom played a part in the constitutional violation.  *Kentucky v. Grahm*, 473 U.S. 159, 166 (1985).  "A 'policy' is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Shorts v. Bartholomew*, 255 Fed.Appx. 46, 57 (6th Cir. 2007) (quoting *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002); see also *Brown v. Shaner*, 172 F.3d 927, 930 (6th Cir. 1999).  A "custom" is so permanent, widespread, or well-settled that it has the "force of law" and need not be formally approved.  *Doe v. Claiborne County*, 103 F.3d 495, 507-08 (6th Cir. 1996).

Plaintiffs' claim that the policy is arbitrary because it requires that vehicles be escorted to the County garage only when the vehicle load weighs 120,000 pounds or more.  Plaintiffs believe that by following this policy, the Deputies violated Plaintiffs' constitutional rights.  Defendants respond by arguing the policy has a rational basis because ODOT characterizes vehicles and loads with a gross weight of 120,000 pounds or more as "super-loads" which are distinguished from "routine issue" SHPs.  Super-loads require a more detailed analysis by ODOT and often cannot be reduced in size or weight.  (Honenfanger Dep. p. 10-11, 16-17).  As such, the process of obtaining an SHP for super-loads takes longer than usual SHPs.  (Honenfanger Dep. p. 17; Reid Dep. P. 40, 67-68; Romes Dep. P. 66).  Thus, the need to find a safe location where the rig can be kept without disrupting traffic will more likely arise.  The policy applies only after the process of weighing and measuring is complete and the permit is determined to be void.  The Court agrees that the Williams County policy is rationally linked to the super-load weight classification established and utilized by ODOT.  Following the policy did not violate Plaintiffs' constitutional rights.

In addition, the policy does not violate Ohio law.  Ohio R.C. §4513.33 states that when an officer determines the weight is unlawful, he or she *may* require the vehicle to stop in a "suitable" place or remain standing until the load can be made legal.  This statute does not, as Plaintiffs argue, require the Deputies to "give options" to a trucker found to be operating under a void permit.  Rather, the statute gives Ohio law enforcement officers the option of requiring a vehicle or load to stop in a suitable location until it can be made legal.  For the reasons stated above, the escort policy encourages against allowing vehicles with super-loads to stop in a suitable place until being made legal.  This does not contradict the discretionary nature of R.C. § 4513.33.

### d. Continued Detention of Rig

Finally, Plaintiffs argue that the Deputies "exacerbated" the length of the "unlawful detention" once the rig was at the County garage by incorrectly requiring Plaintiffs to obtain a local permit or a court order to secure release of the rig.  Viewing the facts in a light most favorable to Plaintiffs, the Court finds that there is no legal support for a Fourth Amendment claim based upon the alleged miscommunication of the need for a local permit or court order in order to allow the rig to resume travel.  Inaccurate communication of information by deputies regarding how to receive a new SHP is not a search or seizure for Fourth Amendment purposes.

Furthermore, Sixth Circuit precedent suggests that Plaintiffs' Fourth Amendment rights triggered at the point of the stop did not continue to exist at the County Garage.  *See Fox v. Van Ossterum*, 176 F. 3d 342 (6th Cir. 1999); *Reed v. Bentley*, Case No. 3:99-CV-7181, 2000 WL 254666 (N.D. Ohio. June 20, 2000).  In *Fox*, the Court affirmed the award of summary judgment in a Section 1983 action based on a claim that the defendants failed to return the plaintiff's drivers' license seized during an inventory search of his vehicle. The Sixth Circuit found that the detention of the license was not a Fourth Amendment seizure because "once that act of taking the property is complete, the seizure has ended and the Fourth Amendment no longer applies." *Id*. at 351.  Likewise in *Reed*, the court rejected the notion that detention of records seized by the police during a warranted search could give rise to a Fourth Amendment right on the ground that post-seizure retention of property is not a Fourth Amendment seizure.  Here, a continued "detention" of the rig at the County Garage is not a seizure.

### 2. Fourteenth amendment

The Fourteenth Amendment states, "no state shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The due process clause contains both a procedural component as well as a substantive component. *See Braley v.Pontiac*, 906 F.2d 220, 224 (6th Cir. 1990). Here, Plaintiffs challenge both components.

### i. Procedural due process

First, Plaintiffs argue that Lanzer and Romes did not have authority to declare the permit "void." Plaintiffs claim that ODOT personnel have exclusive authority to enforce commercial motor vehicle safety. *See* R.C. §5503.34. However, Defendants were enforcing another set of laws, the weight and dimensional laws detailed in R.C. § 5577. Sheriff's Deputies have express authority to enforce these laws. R.C. §5577.13.

Second, Plaintiffs argue that the revocation of the SHP was accomplished without procedural due process because officers enforcing the terms of SHP are given discretion to ignore violations which could potentially void permits but there is no criteria as to which violations should be ignored.

Defendants respond by arguing that Plaintiffs have failed to identify a protected property right that would trigger a procedural due process claim implicated by the Deputies' action. In *Chandler v. Village of Chagrin Falls*, 2008 WL 4523585 at *4 (6th Cir. Oct. 8, 2008), the court explained that a plaintiff must establish "a life, liberty, or property interest protected by the Due Process Clause; that she was deprived of this protected interest within the meaning of the Due Process Clause; and that the state did not afford her adequate procedural rights prior to depriving her of her protected interest" (citing *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)). Due process property rights are created and their dimensions defined from state law, rules, or

21

understandings that secure certain benefits and that support claims of entitlement to those benefits. *Board of Regents of State College v. Roth*, 408 U.S. 563, 577 (1972).

Here, Plaintiffs have failed to present, and this Court has not found, any authority recognizing a property right in a SHP. Analogous Ohio case law leads to the conclusion that obtaining a SHP for permission to operate a nonconforming vehicle is not a protected property right. *Doyle v. Ohio Bureau of Motor Vehicles*, 51 Ohio St.3d 46, 51 (1990) (concluding that a license to operate a motor vehicle is not a property right, but rather a privilege); *State v. Newkirk*, 21 Ohio App.2d 160, 165 (1968) ("[T]o protect others using the highways; and any appropriate means adopted does not deny to a person subject to its provisions any constitutional rights under [Ohio's Constitution]"); *Ohio v. Trinkle*, Case No. L-87-266, 1988 Ohio Lexis 2919 (Lucas Co. App. July 22, 1988) (concluding that a SHP could be voided without an appeals process).

The Constitution determines the adequacy of procedures to satisfy due process. *See Chandler*, 2008 WL 4523585 at * 6 (citing *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972)). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Haag*, 619 F. Supp. 262, 280 (6th Cir. 1985) (quoting *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976).

Here, even if there was a property right at stake, when pre-deprivation process is not feasible and when post-deprivation process is adequate to assess the propriety of the State's action, a due process violation does not exist. *Parratt v. Taylor*, 451 U.S. 527, 539 (1981) (overruled on other grounds by *Daniel v. Williams*, 747 U.S. 327 (1986)); *Vicory v. Walton,* 721 F.2d 1062, 1064 (6th Cir. 1983). It is not feasible to require officers to seek review of their decisions to determine the validity of SHPs prior to escorting vehicles to a safe place. These rigs

22

are of a size that pose a safety threat to other traffic.  Furthermore, meaningful means to assess the propriety of the Deputies' decision to void the permit exist after the decision is made.  If a permit is declared void, truckers can seek a valid replacement permit, including an "emergency permit application" right away.  *See* Ohio Admn Code § 5501: 2-1-07; *See Ohio v. Trinkle,* Case No. L-88-379, 1990 Ohio Lexis 438 (Lucas Co. App. Feb. 9, 1990); *State v. Evans,* 89 Ohio App. 3d 294 (1993).  That process allows the applicant to correct the errors that rendered the first permit void, and immediately be issued a valid permit, if the process is undertaken promptly.

### ii. Substantive due process

Plaintiffs use "substantive due process" as an umbrella under which they group several attacks on features of the Ohio system of weight and dimension restrictions, and the Special Hauling Permits that are issued as a part of that system.  The underlying theory in several of Plaintiffs' arguments is that the language of the OS-1A imposes an "additional" penalty, in that it allows a law enforcement officer to declare the SHP void.  Plaintiffs argue that this is a penalty on top of the statutory penalty imposed by R.C. §4513 and thus the Director of Highways has exceeded his authority by including such a penalty.

However, the Court finds this to be a mischaracterization of the action taken by the Director of Highways.  Plaintiffs do not dispute that the General Assembly properly delegated to the Director the power to decide when a SHP may be issued, and the conditions which must be met to retain it.  The Court concludes that the Director does not exceed his authority by including a condition that a SHP may be rendered void by failure to comply with its terms.  This is not the exercise of the legislative action of creating a new penalty; it is the exercise of the administrative function of determining whether a permit should remain in place.  Such an action is the

withdrawal of the privilege to operate in violation of the law, not an additional penalty. *See State v. Weaver* (1957), 79 Ohio L. Abs. 258; *Ohio v. Trinkle*, Case No. L-87-266, 1988 Ohio Lexis 2919 (Lucas Co. App. July 22, 1988); *Ohio v. Trinkle*, Case No. L-88-379, 1990 Ohio Lexis 438 (Lucas Co. App. Feb. 9, 1990).

On vagueness grounds, Plaintiffs object to the statement included in the OS-1A that moving violations for offenses relevant to the safe movement of a motor vehicle shall render the SHP null and void. Plaintiffs claim that an average individual cannot know all of Ohio's motor vehicle offenses, and this lack of specification renders that condition of the OS-1A too vague to be enforceable.

A statute is unconstitutionally vague and due process is violated when a person of common intelligence must guess at the meaning of a law. *United States v. Caseer*, 399 F.3d 828, 835 (6th Cir. 2005). A statute need only provide fair warning of the nature of the proscribed conduct to survive a vagueness challenge. *U.S. v. Anvari-Hamedani,* 378 F.Supp.2d 821, 830 (N.D.Ohio 2005). Here, the body of knowledge necessary to obtain a driver's license (or commercial driver's license) is the same body of knowledge one must have in order to assure compliance with the OS-1A condition that moving violations can render the permit void. Drivers operating rigs under an Ohio SHP are provided "fair warning" that they must not commit moving traffic violations in order to retain a valid permit. They are not required to "guess" which laws they must follow; they must comply with all Ohio laws that are relevant to safe movement.

More relevant to the instant case is the concern that laws may be deemed unconstitutionally vague if they fail to provide minimal guidelines to guide law enforcement. *Id.* (citing *Kolender v. Lawson*, 461 U.S. 352, 358, (1983)). Here, law enforcement officers are

24

specifically instructed by the terms of the OS-1A that if a traffic violation affects "safe movement," the violation can render a SHP void.  The Court does not find "safe movement" to be an unclear concept in this context.  The Supreme Court has stated that it is "common sense" to recognize that all police officers must use some discretion in deciding when and where to enforce a particular law.  *Chicago v. Morales*, 527 U.S. 41, 47, 62 (1999) (cited with approval in *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 761 (2005)).  If the movement of large and heavy rigs endangers life or property, it is unsafe.  Reasonable law enforcement officers can sensibly determine if a moving violation committed while operating an oversize rig might endanger life or property.

Finally, Plaintiffs argue that the voiding of the SHP was "additional enforcement action" that was unnecessary, and thus motivated only by a desire to raise Williams County revenue.  According to Plaintiffs, the decision to declare the permit void accomplished nothing, since the rig ultimately was allowed to travel under the replacement SHP and was no heavier, wider or longer than the rig was when it was illegally operated under the voided permit.

However, Plaintiffs overlook the necessity of the ODOT review process.  A particular load's width and axel spacings potentially affected the roadway geometrics and the rig's ability to traverse various structures.  (Honenfanger Dep. 96-97).  Hence, a new super-permit analysis based on correct data must be conducted by ODOT to determine if it could travel safely and to identify the appropriate route.  Here, ODOT was eventually able to conclude that travel by the properly described rig could be safely conducted.  Furthermore, the replacement SHP imposed different conditions for safe travel, a state highway patrol escort.

25

The notion that the Deputies voided the SHP merely to assess a fine to increase Williams County revenue also ignores a simple fact: the fine is established by Ohio R.C. §5577.99, not by Williams County edict.  The General Assembly has decided that the fine money collected under the statute "shall be paid into the treasury of the county and credited to any fund for the maintenance and repair of roads, highways, bridges and culverts."  *Id.*  This makes *Rose v. Village of Peninsula*, 839 F. Supp 517 (N.D. Oh. 1993) inapplicable.  That case involved the enforcement of an invalid local ordinance designed to increase local revenue that intentionally conflicted with state law.  By contrast, this case involves the enforcement of state law which dictates the penalties to be imposed and where they are to be paid.

### B. Qualified Immunity

"'Under the doctrine of qualified immunity, government officials acting in their official capacities are protected from being sued in their individual capacities for damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Depiero*, 180 F.3d at 785 (quoting *Greene v Reeves*, 80 F.3d 1101, 1104 (6th Cir. 1996)).  As Plaintiffs have not demonstrated a violation of a statutory or constitutional right, the Defendants are entitled to individual immunity.

### C. Pendant State Law Claims

"The district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  *Blakely v. United States*, 276 F.3d 853, 861 (6th Cir. 2002) (quoting 28 U.S.C. §1367(a)).  When, however, the district dismisses all claims in which it had original jurisdiction, the district court may decline to exercise

26

supplemental jurisdiction over the remaining state-law claims.  *Id*. at 862; *see also* §1367(c).  In deciding whether to exercise supplemental jurisdiction, the court should consider "'judicial economy, convenience, fairness, and comity.'"  *Musson Theatrical, Inc. v. Fed. Express Corp*., 89 F.3d 1244, 154 (6th Cir. 1996) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  When, as here, the court dismisses all federal claims before trial, the court should generally deny jurisdiction over the state-law claims.  *See Robert N. Clemens Trust v. Morgan Stanley DW, Inc*., 485 F.3d 840, 853 (6th Cir. 2007).  Accordingly, the Court dismisses without prejudice Plaintiffs' state-law claims not addressed herein: abuse of process, malicious prosecution, and conversion.  (*See* Doc. 31).

### D. Motions to Strike

Defendants filed motions to strike portions of the affidavits of Ed Reid (Doc. 93) and Howard Robinson (Doc. 94).  Defendants argue that the affidavits contradict Reid and Howard's own testimony in an attempt to manufacture questions of fact.

"A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction."  *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).  "If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.*

 Here, the affidavit sections that allegedly contradict Reid and Howard's previous testimony were not relevant in the Court's summary judgment decisions.  Even if the Court were to deny Defendants' motions to strike on the merits, the Court would reach the same conclusion

on Defendants' motion for summary judgment as a matter of law.  As such, the Court dismisses both motions to strike as moot.

**IV. Conclusion**

For the reasons herein, the Court grants Defendants' motion for summary judgment (Doc. 64) on all federal claims with prejudice, and dismisses as moot Defendants' motions to strike (Doc. 93, 94).  The Court declines to exercise supplemental jurisdiction over the remaining state-law claims and thus dismisses them without prejudice.

IT IS SO ORDERED.

__s/ *David A. Katz*_____
DAVID A. KATZ
U. S. DISTRICT JUDGE